Greg Howard HUTCHINS, individually, Darin B. Jeffries, and Carol Ann Jeffries, individually and as husband and wife; John M. Lynn and Debbie Lynn, individually and as husband and wife, Appellants,

v.

SILICONE SPECIALTIES, INC., Appellee.

No. 76717.

Supreme Court of Oklahoma.

May 18, 1993.

Corrected on Denial of Rehearing Oct. 4, 1994.

Warren Gotcher and Jeff Belote, Gotcher, Brown, Bland & Belote, McAlester, for appellants.

Eugene Robinson, McGivern, Scott, Gilliard, McGivern & Robinson and James R. Elder, Malloy & Elder, Tulsa, for appellee.

WATT, Justice.

Plaintiffs sued Silicone Specialties for damages arising out of injuries sustained by Greg Hutchins, Darin Jeffries, and John Lynn. Plaintiffs claimed that defectiveness of a waterproofing product, Bituthene Primer P–3100, marketed by Silicone Specialties caused their damages.

## FACTS AND PROCEDURAL HISTORY

In December 1985, Oakridge Builders, Inc. was the general contractor on a job to build an addition to the First United Methodist Church building in Bartlesville. Oakridge gave Professional Waterproofing a subcontract to waterproof the foundation of the

addition. Hutchins, Jeffries, and Lynn were employees of Professional Waterproofing.

A trench had been dug along the perimeter of the addition to expose its concrete foundation. It was upon the exposed concrete foundation that Professional Waterproofing was to apply waterproofing materials.

Rain fell frequently during this period. Consequently, the bottom of the trench filled with water. Hutchins, Jeffries, and Lynn built a wooden walkway above the surface of the water in the bottom of the trench to provide a dry surface upon which to stand and walk.

Professional Waterproofing's first attempt to waterproof the foundation failed because the weather was too wet and cold. Silicone Specialties marketed two versions of Bituthene primer, P–3000 for warm weather, and P–3100 for cold weather. Professional Waterproofing had used P–3000 primer in its first attempt at waterproofing the foundation. On December 12, Professional Waterproofing's employees removed the failed P–3000 from the foundation and started to apply P–3100.[1]

The failed attempt at waterproofing put Oakridge behind schedule on the project. After Professional Waterproofing's employees left for the day on December 12, Oakridge covered the trench with plastic sheeting and installed two kerosene-fired space heaters, one at each end of the trench. Oakridge hoped to dry the foundation wall sufficiently to allow Professional Waterproofing to successfully waterproof it. An Oakridge employee notified a Professional Waterproofing employee by telephone of what Oakridge had done, and Professional Waterproofing did not object.

*The Accident*

Hutchins, Jeffries, Lynn, and two other Professional Waterproofing employees returned to the job on December 15 to complete the installation of the P–3100 waterproofing system. The foundation remained so wet the men could not apply the P–3100 primer. Consequently, a Professional Waterproofing worker, Monty Thomas, started to dry the wall with a propane-powered weed burner. The weed burner produced a flame that was approximately two feet long.

Thomas dried part of the east end of the foundation, and Hutchins, Jeffries, and Lynn applied P–3100 primer to it. As Hutchins, Jeffries, and Lynn worked, vapors from the P–3100 accumulated around them beneath the plastic sheeting. Meanwhile, Thomas continued to use the weed burner on other portions of the foundation. Unknown to anyone until after the accident, kerosene used to fuel the space heaters had been spilled and floated on the water beneath the walkway in the bottom of the trench. When Thomas was approximately thirty feet from Hutchins, Jeffries, and Lynn, his weed burner ignited kerosene floating on the water. The burning kerosene moved the thirty feet between Thomas and the point at which Hutchins, Jeffries, and Lynn worked. The flame ignited the accumulated P–3100 vapors and the resulting fire seriously burned Hutchins, Jeffries, and Lynn.

*The P–3100 Primer*

W.R. Grace, the manufacturer of the P–3100 waterproofing system, markets it only to professional users in the building trades. Silicone Specialties sold it only to such users. The label on the P–3100 primer container noted that it was "FOR PROFESSIONAL USE ONLY," and the label bore explicit safety instructions.[2] Hutchins, Jeffries, and

---

1. The Bituthene products are manufactured by W.R Grace & Co.–Conn. Grace was joined as a third party defendant by Frank Riehart, the architect. Riehart was originally a codefendant to plaintiffs' case. Riehart also joined Oakridge, and Professional Waterproofing, and its owners as third party defendants. In the trial court, plaintiffs legal theories included negligence, as well as manufacturers products liability. As the matter stands on appeal, however, the only parties are plaintiffs and Silicone Specialties. The

only issue is whether there are disputed issues of material fact to support plaintiffs' manufacturers products liability claim against Silicone Specialties.

2. The instructions on the P–3100 primer label relating to fire hazard and general use stated:

FOR PROFESSIONAL USE ONLY
WARNING FLAMMABLE—READ SAFETY INSTRUCTIONS LEFT SIDE PANEL

Lynn did not read the P–3100 primer label before using it. In their depositions Hutchins, Jeffries, and Lynn admitted that the P–3100 safety instructions clearly identified the very dangers to which they exposed themselves on the day of the accident. Hutchins, Jeffries, and Lynn concede the fact that if they had read the instructions before the accident they would not have used the P–3100 primer as they did.

### The Trial Court's Ruling

Following extensive discovery the trial court entered summary judgment for defendant. Plaintiffs appealed. Plaintiffs' theory of recovery was exclusively grounded in manufacturers' products liability.[3] This appeal turns on whether there is evidence in the record from which a trier of fact could conclude that the P–3100 primer was unreasonably dangerous.

The trial court stated three reasons for its holding: (1) Plaintiffs' admitted that they did not read the P–3100 primer directions before using it, and had they done so they would not have used the P–3100 primer as they did. (2) Plaintiffs violated the P–3100 primer instructions by using it in a plastic covered trench. (3) The fire caused by the torch igniting the kerosene was an intervening cause that insulated defendant from liability.[4]

### ISSUE

There is but one issue before us. Did the trial court correctly grant summary judgment on the ground that there was no disputed issue of material fact concerning whether the P–3100 primer was unreasonably dangerous? We answer yes.

SAFETY INSTRUCTIONS [from left side panel of container]—Read before use.
WARNING FLAMMABLE
Contains highly volatile petroleum solvents
Vapors may ignite explosively
Vapors heavier than air and may travel to distant sources of ignition and flash back
Always use with adequate ventilation to prevent vapor build-up—forced ventilation may be necessary in pits and other confined areas
Keep away from heat, sparks and open flame
Enforce no-smoking for all trades on job site
Keep container closed when not in use

### DISCUSSION

#### The Standard of Review

Title 12 O.S.1984 Supp., Ch. 2 App., Rules for Dist.Cts.Rule 13(e), and *Erwin v. Frazier,* 786 P.2d 61 (Okla.1989) provide our standard of review in summary judgment matters. The court should render summary judgment when there is no substantial controversy as to any material fact, and one of the parties is entitled to judgment as a matter of law. The court must also find that reasonable people could not reach different conclusions on the undisputed facts. All inferences to be drawn from the undisputed facts must be viewed in the light most favorable to the party opposing the motion. Nevertheless, the mere contention that facts exist, or might exist, to create a fact question is insufficient. *Mengel v. Rosen,* 735 P.2d 560 (Okla.1987).

#### Manufacturers' Products Liability

■ To prevail on a manufacturers' products liability theory plaintiffs were required to prove (1) the P–3100 primer caused their injuries, (2) a defect existing at the time the P–3100 primer left the manufacturer caused plaintiffs' injuries, and (3) the defect made the P–3100 primer unreasonably dangerous to plaintiffs. *Kirkland v. General Motors Corp.,* 521 P.2d 1353, 1363 (Okla.1974).

Plaintiffs argue that an opinion expressed by their expert supports their claim that P–3100 primer was defective. The expert stated three reasons why, in his opinion, P–3100 was defective. First, he said it was dangerous because the instructions did not state the flash point of P–3100. Second, he claimed the instructions did not explain how to ventilate the area where the P–3100 primer was to

In case of fire use Foam, dry chemical or CO2

.    .    .    .    .

3. At an earlier stage of the proceedings plaintiffs advanced various other theories of recovery. Those theories passed from the case, however, and are not at issue in this appeal.

4. Because of the conclusions we reach today, it is unnecessary for us to address the correctness the trial courts holding that the kerosene fire was an intervening cause. We therefore decline to do so.

be used. Finally, the plaintiffs' expert contended that P–3100 was inherently and intrinsically dangerous because other primers containing non-flammable ingredients were available on the market. We disagree.

Plaintiffs' argument, and their expert's opinion overlook the fact that plaintiffs, Hutchins, Jeffries, and Lynn, were trained workers using the P–3100 primer in an industrial setting. Grace sold and Silicone Specialties distributed P–3100 waterproofing materials only to building trades professionals.

The situation before us today differs significantly from *Smith v. United States Gypsum Co.*, 612 P.2d 251, 253 (Okla.1980) where the manufacturer did not limit the marketing of its highly flammable adhesive product to trained craftsmen. There the manufacturer widely marketed its product to consumers. Plaintiff was a home handyman who was badly burned when the adhesive he was using in his home caught fire. We noted that an unreasonably dangerous product is one that is dangerous to an extent beyond the reasonable expectations of an "ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." We held that the adequacy of the manufacturer's directions was a jury question.

Here, however, P–3100 primer was marketed in a manner to avoid its use by an "ordinary consumer." Hutchins, Jeffries, and Lynn were professional waterproofers, not "ordinary consumers." Because a product might be unreasonably dangerous in the hands of a home handyman does not make it so when used on a commercial work site by professionals.

We held in *Duane v. Oklahoma Gas & Electric Co.*, 833 P.2d 284, 287 (Okla.1992) that where a product is used in an industrial setting by one supposedly skilled at his job a manufacturer has "no duty to warn of dangers inherent in the task or which are created by oversight or negligence of the contractor or fellow employees." A defendant in a manufacturers' products liability case is not liable for misuse of its product in a manner that is not foreseeable. *Fields v. Volkswagen of America, Inc.*, 555 P.2d 48 (Okla. 1976).

Here, the P–3100 container carried explicit warnings that P–3100 primer was highly flammable, that it should not be used in poorly ventilated areas, and that no flame should be near it. Defendant was entitled to assume that Hutchins, Jeffries, and Lynn would heed its warnings. Defendant was not required to foresee that professional waterproofers would fail to read its warnings, and then use the P–3100 in a manner that the manufacturer's instructions expressly warned against.

The trial court correctly granted Silicone Specialties' motion for summary judgment.

CERTIORARI PREVIOUSLY GRANTED, COURT OF APPEALS' OPINION VACATED, TRIAL COURT'S JUDGMENT AFFIRMED.

HODGES, C.J., LAVENDER, V.C.J., and SIMMS, HARGRAVE and OPALA, JJ., concur.

KAUGER, J., concurs in part, dissents in part.

ALMA WILSON, J., dissents.

SUMMERS, Justice, concurring in part, dissenting in part.

I concur in the Court's resolution of the issue involving adequacy of warnings. I dissent from affirmance of the trial court's summary judgment for the reason that the plaintiff's other theory, that of defective design, has not been fully addressed on appeal.

ALMA WILSON, Justice, dissenting:

This manufacturers' liability claim arises out of the performance of a construction contract for an addition to the First United Methodist Church in Tulsa, Oklahoma. Three construction workers were severely burned by a flash fire or explosion of vapors from the waterproofing primer. These injured workers claim that the waterproofing primer was unreasonably dangerous because the manufacturer failed to provide adequate instructions and warnings and thus, the distributor, Silicone Specialties, Inc., is liable for their injuries.

The following facts are not in dispute. Oakridge Builders, Inc. was the general contractor and Professional Waterproofing Company was a subcontractor. The construction contract required the use of Grace Bituthene Waterproofing System manufactured by W.R. Grace & Co.; required installation of the waterproofing system by an installer with no less than three years successful experience installing Grace Bituthene Waterproofing System and certified or accepted by Grace; required the contractor to obtain safety information from Grace; and, required the architect, Grace's representative, waterproofing installer and installers of each component of work requiring coordination with waterproofing work to meet prior to installation of waterproofing for the purpose of reviewing material selections and procedures to be followed in performing the waterproofing work.

On December 4, 1986, the architect, the general contractor, the waterproofing subcontractor and a representative of the manufacturer and distributor met at the job site for the purpose of reviewing the correct procedures for the application and installation of the Bituthene Waterproofing System. The manufacturer/distributor's representative accepted the subcontractor as having experience in installation of Bituthene Waterproofing System. The group inspected the concrete basement area to be waterproofed. The group noted that the Prime P–3000 materials were at the job site. The architect expressed concern about using the Prime P–3000 as specified in the contract because of the cold weather. The manufacturer/distributor's representative advised that the Prime P–3100, recommended for use in weather temperatures between 25 and 40 degrees fahrenheit, was not yet available.

The Prime P–3000 waterproofing system was installed. The weather remained cold, and turned rainy. By December 12, 1986, it was obvious that the Prime P–3000 waterproofing had failed due to the cold and wet weather. The construction timetable was squeezed by the failed waterproofing. The concrete basement walls were wet and water had gathered in the open trench along the concrete walls. To prevent further accumulation of water, the general contractor constructed panels of Visquene plastic and covered the concrete walls and the trench, creating a tunnel-like formation open at both ends. Kerosene heaters were placed at each end of the plastic covering to dry out the concrete so the waterproofing could be completed.

There is no dispute that on December 15, 1986, the efforts to dry the concrete continued and simultaneously the waterproofing work was resumed, which resulted in the injurious flash fire and vapor explosion. There is no dispute that the injured workers did not carefully read the instructions on the containers of P–3100 primer. However, whether the distributor assured the safety of the waterproofing conditions and procedures used on December 15, 1986 in installing the Prime P–3100 water proofing system is a disputed material fact in this case.

Summary judgment should be granted only if it is perfectly clear that there is no material fact at issue. *Northrip v. Montgomery Ward and Co.*, 529 P.2d 489 (Okla. 1974). For summary judgment to be appropriate, the trial court must not only find there is no substantial controversy as to any material fact, but also that reasonable people could not reach differing conclusions from the undisputed facts. Even if the trial court anticipates that a directed verdict will be necessary, summary judgment must not deprive a litigant of the right to a jury trial of disputed facts. *Flanders v. Crane Co.*, 693 P.2d 602, 605 (Okla.1984).

I cannot join in the majority's finding that the distributor of Prime P–3100 was under no duty to foresee that the workers would not carefully read the instructions on the containers of primer nor that the primer would be used in a hazardous manner. In tort law, foreseeability tests the existence of a duty allegedly breached. In this case, the manufacturer/distributor voluntarily participated in the waterproofing stage of the construction project to assure safe and successful installation. Whether the manufacturer/distributor should have foreseen the flash fire and explosion in this case must be resolved even though the distributor assumed contractual safety duties. The disputed fact issue is whether the failure to warn or in-

struct the subcontractor about the flash point of the P–3100 primer rendered the product unreasonably dangerous in the context of the manufacturer/distributor's active participation in the construction project and the under the conditions and procedures actually used for waterproofing installation of the First United Methodist Church addition on December 15, 1986.

Further, I do not agree with the majority that *Duane v. Oklahoma Gas & Electric Company*, 833 P.2d 284 (Okla.1992) stands for the proposition that as a matter of law "where a product is used in an industrial setting by one supposedly skilled at his job a manufacturer has 'no duty to warn of dangers inherent in the task or which are created by oversight or negligence of the contractor or fellow employees.'" In affirming the trial court's summary judgment, this Court found that the manufacturers, Shell and Chevron, had no reason to anticipate that a knowledgeable user, OG & E, would create a dangerous situation by pumping compressed air into the switch from which the oil had been drained, and then grind into that tank. *Duane v. Oklahoma Gas & Electric Company*, 833 P.2d at 287. The summary judgment record in this case establishes that Silicone Specialties, Inc. had a duty to review the manner of waterproofing installation and that it had knowledge of the failed installation due to cold and wet weather. This record could support a finding that Silicone Specialties, Inc. should have anticipated the hazardous situation and the unreasonable danger of Prime P–3100 when used in that situation and the resulting injury to the plaintiffs.

*Duane* stands for the proposition that a successful manufacturers' liability claimant must prove that the manufacturer could have foreseen the particular use, the danger involved in the use and the user's knowledge or lack of knowledge of the danger and that the manufacturer's failure to warn of the foreseeable use was the proximate cause of the injury. Silicone Specialties, Inc.'s duty and foreseeability are disputed and remain unresolved fact issues. I agree with the Court of Appeals. Summary judgment is inappropri-

ate in this case. Accordingly, I respectfully dissent.